# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3516 | **DATE** | 5/5/2003 |
| **CASE TITLE** | Robert Anthony Johnson vs. Charlene Collins et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: Defendant's motion for summary judgment is granted in part and denied in part [81-1]. This case is set for status on Tuesday, 6/3/2003 at 9:00 a.m.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | MAY 07 2003 | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TSA | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT ANTHONY JOHNSON, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 98 C 3516<br>) |
| CHARLENE COLLINS, PAMELA MANNIE and all unknown others, in their individual and/or official capacities, | ) Wayne R. Andersen<br>) District Judge<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM, OPINION AND ORDER

This matter is before the Court on defendants' motion for summary judgment on all counts alleged in plaintiff's Third Amended Complaint. Plaintiff Robert Johnson has filed a *pro se* action against defendants Charlene Collins and Pamela Mannie, employees of the Illinois Department of Children and Family Services ("DCFS"), in their individual and official capacities. He has also filed suit against certain unknown investigators who allegedly conducted late night visits to his home. Collins is a DCFS caseworker and Mannie is a DCFS caseworker supervisor. Johnson's Third Amended Complaint asserts that the defendants improperly retaliated against him in violation of 42 U.S.C. § 1983 after he contacted then-Senator Carol Moseley-Braun to complain about the defendants' handling of his family's child welfare case. In addition to this alleged federal violation, Johnson has raised several state law claims, including invasion of privacy, negligence, abuse of process and intentional infliction of emotional distress.



DOCKETED
MAY - 7 2003



Magistrate Judge Morton Denlow previously dismissed Johnson's 42 U.S.C. § 1983 claim on defendants' 12(b)(6) motion. *Johnson v. Collins*, 58 F. Supp. 2d 890 (N.D. Ill. 1999). In granting this motion, Judge Denlow held that Johnson had a reasonable opportunity to raise the purported constitutional claim in the numerous state Juvenile Court proceedings regarding his family's case with DCFS and that he was barred by the Rooker-Feldman doctrine from subsequently raising this claim in federal court. Judge Denlow further held that Johnson's retaliation claim was barred by the doctrine of qualified immunity. The Seventh Circuit reversed, holding that the Rooker-Feldman doctrine was inapplicable to the plaintiff's claims and that qualified immunity does not protect a government official who violates a clearly established constitutional right. *See Johnson v. Collins*, 2001 U.S. App. LEXIS 3227 (7th Cir. Feb. 23, 2001).

The defendants have now filed a motion for summary judgment. For the following reasons, the motion for summary judgment is granted in part and denied in part.

## I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A plaintiff cannot rest on mere allegations, but must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct.

2

2548 (1986). The Court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See EEOC v. Sears Roebuck & Co.*, 233 F.3d 432, 436-37 (7th Cir. 2000). Differing accounts of the same set of events can establish the existence of a genuine issue of material fact. *Payton v. Rush-Presbyterian-St. Luke Medical Center*, 82 F. Supp. 2d 901, 909 (N.D. Ill. 2000). Finally, we note that Johnson is a *pro se* litigant and that we must construe his pleadings liberally. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285 (1976).

## II. Background Facts

This lawsuit arises from the defendants' management of a Juvenile Court case involving plaintiff's children, Jamal and Jamir Johnson. When this case began, the children lived with their mother, Carla Eason, and her then boyfriend, Terrence Miller. Eason had custody of the children and Johnson had visitation rights. In March 1995, Johnson suspected that the children were being medically neglected, and he called the DCFS hotline to report his concerns. (Pl.'s Stat. Facts ¶ 35.) DCFS investigated but took no action. (*Id.* at 36.) Three months later, when Johnson picked up the children for a scheduled visitation, he noticed bruises on Jamir's face and took the children to the hospital. (Pl.'s Stat. Facts ¶¶ 41-42.) Hospital personnel suspected physical abuse and reported the matter to DCFS, which took the children into protective custody. (*Id.*) Shortly thereafter, the children were released to the care of their maternal grandmother, Norma Eason. (Defs.' Stat. Facts ¶ 67.) Johnson feels strongly that this placement with the children's maternal grandmother was inappropriate due to her mental health problems. Even if that placement was inappropriate, it has nothing to do with the defendants' treatment of Johnson himself and, thus, has no bearing on the allegations

3

raised in plaintiff's Third Amended Complaint.

Defendant Mannie assumed responsibility for the Johnson family case in July 1995 as a supervisor to caseworker Vanessa Green, who subsequently left DCFS in November 1995. (Def.'s Stat. Facts ¶¶ 48, 50.) Defendant Collins took over management of the case in December 1995. (Def.'s Stat. Facts ¶ 57.) DCFS completed an initial service plan for the family in July 1995 that provided supervised visitation rights to both Johnson and Eason and required them to attend parenting classes and individual counseling. The goal of the service plan was for the children to return to the home of Carla Eason. (Pl.'s Ex. 14, DCFS Service Plan.) The service plan developed for Johnson and Eason was typical of situations in which DCFS had taken custody of children during the investigation of potential abuse or neglect. (Pl.'s Ex. 11, Trans. Juv. Ct., p. 21-22.)

In November 1995, the Juvenile Court returned the children to the custody of Carla Eason under an order of protective supervision and granted Johnson supervised visitation. (Pl.'s Ex 11. Trans. Juv. Ct., p. 82.) Johnson was to receive unsupervised visitation *at the discretion of DCFS* pending his completion of parenting classes and individual counseling. (*Id.* emphasis added.) This requirement was imposed by the court based on the recommendation of the children's guardian ad litem ("GAL"), and it explicitly superseded the existing domestic relations order that granted custody to Eason and unsupervised visitation to Johnson. (Pl.'s Ex. 11, Trans. Juv. Ct., p. 8.) While there was no evidence to suggest that Johnson had ever abused or neglected the boys, the GAL did not recommend unsupervised visitation because she did not believe Johnson had fully invested himself in all required services. (*Id.*) Thus, the transcript of this November 1995 Juvenile Court proceeding

4

indicates that Johnson was kept on supervised visitation by an order of the Court and that the judge reached this decision based upon the recommendation of the GAL, and not the defendants. The determination of when Johnson should receive unsupervised visitation was left to the discretion of the defendants.

Despite a service plan that called for weekly supervised visitation between Johnson and his children, only one such visit took place between November 1995 and January 1996 because Eason did not make the children available for scheduled visitation, a problem acknowledged by Collins during questioning by the Juvenile Court on January 17, 1996. (Pl.'s Ex. 45. Trans. Juv. Ct, p. 8-9.) Though Johnson was not at fault for this lack of visitation, Collins testified that the family's case could not be closed until both parents completed parenting classes and until Johnson had more consistent visitation with the children. (*Id.*) Frustrated at the lack of visitation, the court entered an order directing Collins to take personal responsibility for coordinating the visitation and directing Carla Eason to comply fully. (*Id.* at 24.) Johnson completed parenting classes on January 31, 1996. (Pl.'s Exh. 30, Cert. of Completion.)

Supervised visitation still did not occur as scheduled between January 17, 1996 and the next scheduled status hearing on February 27, 1996. Though the record is unclear as to what went wrong, apparently Johnson himself missed several scheduled visits with the children. (Pl.'s Ex. 46, Trans. Juv. Ct, p. 8.) As a result, at the February 27 hearing, the GAL objected to DCFS' recommendation of unsupervised visitation for Johnson, and he remained on a supervised visitation schedule.

On February 23, 1996, Johnson sent the first of four letters to Senator Carol Moseley-

Braun to register his complaints about the DCFS handling of his family's case. He also filed several administrative complaints with DCFS. Johnson's letter to the Senator alleged in part that DCFS policies discriminated against single fathers and that the caseworkers were retaliating against him by keeping him on supervised visitation. (Pl.'s Compl. ¶ 7.) Johnson's administrative complaints and his letters to the Senator alleged that Collins and Mannie were retaliating against him because of his frequent complaints about their management of his family's case. (Pl.'s Stat. Facts ¶ 56.) Apparently, when the Senator's office and the various administrative agencies inquired about the case, the defendants told them that a change to unsupervised visitation would require an order by the Juvenile Court. (Mannie Dep., p. 36-37.) As indicated above, the court had previously determined that unsupervised visitation could be granted at the discretion of DCFS.

In April 1996, Johnson was granted unsupervised visitation. However, the matter did not end there. In June 1996, Eason's brother took the children to the hospital because he suspected that Eason or Terrence Miller was abusing them. (Pl.'s Stat. Facts ¶ 72.) The hospital found that the youngest child, Jamir, had a broken arm that had been allowed to heal untreated and that both children had bite and burn marks on their bodies and were medically neglected. (Pl.'s Stat. Facts ¶ 73.) The hospital called the DCFS hotline and the children were taken back into protective custody. Shortly thereafter, DCFS placed the children with Johnson's mother. In August 1996, custody was granted to Johnson under an order of supervision, which meant that DCFS was to continue its involvement in the case. At this hearing custody, Collins testified that she would visit the children at least monthly, which she did from August until the case closed in January 1997. (Collins Dep., p. 73-76). Johnson

lived in Kenosha, Wisconsin and DCFS guidelines required home visits because the children lived less than 50 miles from the Illinois state line. (Def.'s Ex. 5, DCFS Policy.)

The Johnson family case was up for closure on December 9, 1996. As this court date drew near, Johnson became increasingly nervous that defendants would try to keep his case from closing. In early December, he spoke with Collins and told her that he wanted his case to close and that he would be contacting his Senator to express his concern that DCFS might retaliate against him and keep his case open. (Johnson Dep., p. 78-79.) According to Johnson, Collins told him that he was being a troublemaker, that she was going to recommend additional counseling because of his behavior, and that she did not believe his family's case should close. (*Id.*) Johnson sent a letter to Senator Moseley-Braun on or about December 10, 1996 and re-sent the same letter on or about December 27, 1996. (Pl.'s Stat. Facts ¶ 11.)

Johnson's case did not conclude at the December 9, 1996 court date. Though neither defendant was at that hearing, the caseworker filling in for Collins testified that Collins did not recommend closure because of an alleged altercation between Johnson and Eason. (Pl.'s Ex. 16, Trans. Juv. Ct, p. 6.) The GAL indicated that the children told her of the altercation and that she wanted to interview Johnson's grandmother and speak with authorities in Wisconsin to confirm or refute the incident before closing the case. (*Id.* at 7.) The court continued the matter until January 8, 1997 to allow DCFS to investigate the incident. On December 27, 1996, Collins submitted a referral for Johnson to undergo a second psychological evaluation. The counseling agency mailed a referral to Johnson on or around January 4, 1997. (Pl.'s Ex. 6, Couns. Ref.)

Collins contends that this referral was made as part of the typical process of gathering

information for case closure. (Defs.' Stat. Facts ¶ 72.) On December 30, 1996, Collins and Mannie conducted a monthly visit with the children. Johnson's brother, David Johnson, alleges that during this visit the defendants told him that Johnson was causing a lot of commotion by complaining to other organizations and that "they could play hardball too." (D. Johnson Aff.) Plaintiff alleges that he believed this comment to be a threat to keep his case from closing on January 8, 1997. Additionally, Johnson claims that unknown investigators visited his and Eason's home four times in December 1996 and January 1997. (Pl.'s Compl. ¶¶ 10-11; Johnson Dep., p. 88-100.) While Johnson does not know the identify of the investigators, or even the office they represented, he claims that they told him that they were following up on concerns expressed by the Chicago DCFS office. (Johnson Dep., p. 90.) Nevertheless, the defendants recommended closure of the Johnson family case at the January 8, 1997 hearing and the Juvenile Court entered an order to that effect on that date.

### III. Discussion

Plaintiff's Third Amended Complaint asserts a federal claim under 42 U.S.C. § 1983 as well as four state law claims. The Court's jurisdiction over these state claims rests upon the existence of a valid federal claim. *UMW v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130 (1966). We will review defendants' motion for summary judgment against each of the claims raised by Johnson.

#### A. First Amendment Retaliation

Johnson claims that the defendants retaliated against him after he complained about their handling of his family's case. Examples of this alleged retaliation include denying him unsupervised visitation, scheduling appointments at inconvenient times, recommending a

8

second psychological exam, delaying closure of the case, communicating threats to his brother, and causing late night visits to his family's home. To evaluate plaintiff's Section 1983 claim for retaliation in violation of the First Amendment, the Court must use a three-step analysis. First, we must determine whether plaintiff's speech was constitutionally protected. Second, we must evaluate whether defendants' actions were motivated by plaintiff's constitutionally protected speech. Finally, if the plaintiff can establish that his speech was a motivating factor in defendants' actions, we must assess whether the defendants would have taken the same action irrespective of plaintiff's exercise of his First Amendment rights. *Kokinnis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

Determination of whether Johnson's speech was constitutionally protected is a matter of law and turns on whether the speech addressed a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983). If plaintiff's speech did address a matter of public concern, the Court would then use a balancing test to determine whether the speech was constitutionally protected. *Landstrom v. Illinois Dept. of Children and Family Services.* 699 F. Supp. 1270, 1278 (N.D. Ill. 1988). If Johnson's speech involved purely personal complaints, it cannot support a First Amendment claim. *Landstrom v. Illinois Dept. of Children and Family Services*, 892 F.2d 670, 679 (7th Cir. 1990). This means that, if Johnson complained solely to Collins and Mannie and if his complaints only addressed the defendants' handling of his family's case, then his speech would not address a matter of public concern and would not be entitled to First Amendment protection. Nevertheless, the record is clear that Johnson communicated with Senator Moseley-Braun and that he indicated in these communications that the defendants discriminated against non-custodial fathers. (Pl.'s Compl.

9

¶ 7.) DCFS' treatment of non-custodial fathers is a matter of public concern. Johnson's communications with Senator Moseley-Braun were, therefore, protected by the First Amendment.

The second step of this analysis is to determine whether the defendants' actions were motivated by the protected speech. To establish this claim, Johnson must allege "a chronology of events from which an inference of retaliation may plausibly be inferred." *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000). In this step of the analysis, the Court must examine the nexus between the protected speech and the defendants' alleged retaliatory actions. If such a nexus can be established, the defendants then have an opportunity to demonstrate that they would have taken the same action in the absence of plaintiff's exercise of protected speech. If they are successful, Johnson would then have to demonstrate that the proffered reasons were pretextual. *King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir. 1999). Because there is no justification for harassing people for exercising their constitutionally protected rights, the injury alleged need not be great to be actionable. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

Johnson first claims that the defendants retaliated against him by not using their discretion to grant him unsupervised visitation until April 1996. Since plaintiff first communicated with Senator Moseley-Braun on February 23, 1996, we will only examine those actions that occurred after this date. The record actually indicates that the defendants recommended unsupervised visitation at Juvenile Court proceedings on February 27, 1996, but the children's guardian ad litem objected because Johnson was not following through with supervised visitation. (Pl.'s Ex. 46, Trans. Juv. Ct., p.7-8.) Based on the GAL's objection,

10

the court did not enter an order granting Johnson unsupervised visitation but instead ruled that the November 17, 1995 order allowing unsupervised visitation at the discretion of the DCFS remain in effect. The DCFS finally granted unsupervised visitation in April 1996. (Pl.'s Stat. Facts ¶ 57.)

There is no basis for finding that the defendants' refusal to use their discretion to allow unsupervised visitation prior to April 1996 was motivated by plaintiff's protected speech or that their proffered reason for delaying unsupervised visitation was pretextual. The guardian ad litem is not a defendant in this case. Accordingly, we find that the type of visitation Johnson had with his children has no evidentiary value in proving his claim of retaliation. Johnson alleges no specific acts of retaliation between the time he obtained unsupervised visitation in April 1996 and early December 1996 when his case was about to close. By April, he had already completed parenting classes and individual counseling so there were no situations in which defendants could have intentionally scheduled service appointments at inconvenient times. Thus, Johnson's retaliation claims must rest solely upon the defendants' actions in December 1996 and January 1997.

Johnson claims that the defendants committed several acts of retaliation against him during this time period, including threats made during a phone conversation in early December, causing a one-month delay in closing his family's case, communicating threats about Johnson to his family, referring him for a psychological evaluation in an effort to prevent the case from closing, and causing middle of the night visits to his Wisconsin home. The factual circumstances surrounding nearly all of these allegations are disputed.

11

Indeed, there are only two claims for which we do not believe there are genuine issues for trial. The first is Johnson's assertion that defendants intentionally kept his case from closing at the December 9, 1996 Juvenile Court proceeding. The record indicates that the defendants were not even present, and, while Collins was not recommending closure based upon an alleged altercation between Johnson and Eason, the GAL also indicated that the children told her about the fight. (Pl.'s Ex. 16, Trans. Juv. Ct., 5-7.) Accordingly, the case was continued until January 8, 1997 so that DCFS could investigate the incident. The record demonstrates a valid reason for continuing the case, and we do not believe that a reasonable jury would find that the defendants' stated reasons for recommending continued monitoring were pretextual.

We also find that Johnson's mere allegation about late-night visits to his home fails to raise a valid issue for trial. Johnson claims that defendants orchestrated four visits to his and Eason's homes in late December 1996 and early January 1997, and that two of these visits occurred at 2 a.m. and 6 a.m., respectively. (Pl.'s Compl. ¶¶ 10-11.) Johnson does not know the identity of these investigators, nor the agency they purportedly represented. However, he does allege they told him that they were following up on concerns from caseworkers from the Chicago DCFS office. (Johnson Dep., p. 90.) Defendants disclaim any knowledge of, or responsibility for, these visits. Discovery apparently did not provide evidence to substantiate Johnson's claim. At this point, the visitors have not been identified and thus any comments they allegedly made would be inadmissible at trial. Accordingly, this evidence is inadmissible unless Johnson can establish a foundation for these alleged visits before trial.

We cannot reach the same conclusion regarding Johnson's other allegations. Johnson

12

first claims that defendants threatened to keep his case from closing in a phone conversation in early December 1996. According to Johnson, he spoke with Collins and Mannie to let them know that he wanted his family's case to close and that he would be contacting Senator Moseley-Braun's office to communicate his concerns. (Defs.' Stat. Facts ¶ 18.) During this phone discussion, Collins told Johnson that he was being a troublemaker, that she did not think the case should close, and that she was going to recommend additional counseling. (*Id.*) Johnson did, in fact, correspond with the Senator on or about December 10, 1996 and December 27, 1996. The record reflects that Collins indeed recommended a second psychological evaluation on December 27, 1996. (Pl.'s Exh. 6., Couns. Ref.) The content of this phone conversation is disputed, and the nature of the call is relevant to a determination of whether defendants threatened Johnson with keeping his case open because he was being a "troublemaker," i.e. engaging in protected speech with Senator Moseley-Braun.

There is also a factual dispute regarding the second referral for a psychological evaluation. Defendants claim that DCFS typically recommends a psychological evaluation of custodial parents before closing a case. However, they provide no evidence to substantiate this claim. Further, we note that the open-ended questions on the referral, and the fact that the defendants allowed the case to close even though Johnson did not complete the evaluation, cast some doubt on their claims. The issue was never raised at the December 9 Juvenile Court proceedings as a condition of closing and, as stated above, the only reason the case did not close on that date was due to an alleged fight between Johnson and Eason, not because Johnson failed to complete a final psychological exam. A reasonable jury could find that this referral was made to harass the plaintiff.

Similarly, there is a factual dispute regarding the defendants' visit to Johnson's mother's home in late December 1996. Johnson's brother, David, was present when defendants came to his mother's home on December 30, 1996 to follow-up on the alleged dispute between Johnson and Eason. According to David Johnson, the defendants told him that Johnson was "causing a lot of unnecessary commotion" by "making unnecessary complaints to other organizations" and that they could "play hard ball too." (Pl.'s Ex. 2, D. Johnson Aff.) Clearly, the nature of this conversation is a disputed factual question that is best left to a jury.

Even if defendants committed all of these acts of harassment and intimidation, Johnson must still establish a nexus between his protected speech and defendants' actions. Johnson can prove his claim of retaliation if he can establish that the defendants retaliated against him for any of his protected communications with the Senator. Evaluating all of the evidence in a light most favorable to Johnson, we believe that a reasonable jury could find that the defendants retaliated against Johnson because he complained about their conduct to Senator Moseley-Braun. Further, we note that the defendants cannot validly assert a claim of qualified immunity for these actions at this stage of the proceedings because this immunity only applies when the conduct of government officials does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). The plaintiff has made a prima facie showing that the defendants violated his First Amendment rights. Proof of this claim would undermine a defense of qualified immunity.

Therefore, we deny the defendants' motion for summary judgment on Johnson's

14

Section 1983 claim of retaliation for constitutionally protected speech.

B. Pendant State Claims

Johnson has provided no specific evidence in support of his state claims for invasion of privacy, negligence, abuse of process and intentional infliction of emotional distress. However, we will assume for purposes of this motion that plaintiff believes that the same set of facts supporting his federal claim provides evidence for these claims.

Defendants, on the other hand, claim that they are entitled to protection under state rules of sovereign immunity. In Illinois, a conditional or qualified privilege requires proof of good faith. *See Poulos v. Lutheran Social Services*, 312 Ill. App. 3d 731, 744, 728 N.E.2d 547 (1st Dist. 2000). The defendants rely upon *Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001), to support their claim that the employment-related actions of DCFS employees are protected by the doctrine of sovereign immunity. However, the defendants will only be protected by the doctrine of sovereign immunity if there is no allegation that they acted beyond the scope of their authority through wrongful acts, in violation of statutory or constitutional law, or in excess of their authority. *Id.* at 441. A finding that the defendants retaliated against Johnson for constitutionally protected speech would undermine the defense of sovereign immunity, and thus we cannot say at this stage of the litigation that the defendants are protected by this privilege.

*1. Invasion of Privacy*

Johnson claims that the defendants invaded his privacy by visiting his family's home on December 30, 1996 and communicating threats about him to his brother, David Johnson. (Johnson Dep., p. 140.) It is generally held that there are four privacy torts in Illinois,

15

including intrusion upon the seclusion of another, the appropriation of the name or likeness of another, publicity given to private life, and publicity placing a person in false light. *Lovgren v. Citizens First National Bank*, 126 Ill. 2d 411, 416, 534 N.E.2d 987 (Ill. 1989) (citing Restatement (Second) of Torts §§ 652B through E at 378-394 (1977)). Johnson's invasion of privacy claim can best characterized as "intrusion upon the seclusion of another." While the Illinois Supreme Court has not officially recognized this tort, it appears that a majority of the Illinois Appellate Court Districts have held this tort to be actionable. *See Benitez v. KFC National Management Co.*, 305 Ill. App. 3d 102, 714 N.E.2d 1002 (2d Dist. 1999); *Davis v. Temple*, 284 Ill. App. 3d. 983, 673 N.E.2d 737 (5th Dist. 1996); *Melvin v. Burling*, 141 Ill. App. 3d 786, 490 N.E.2d 1011 (3d Dist. 1986). Defendants do not challenge the existence of the cause of action, but they do assert that the tort has a one-year statute of limitations and that Johnson added the claim well after this period. *See* 735 ILCS 5/13-201; *Hrubec v. National R.R. Passenger Corp.*, 778 F. Supp. 1431 (N.D. Ill. 1991), *rev'd. on other grounds*, 981 F.2d 962 (1992).

Even if the statute of limitations on Johnson's privacy claim had not run by the time Johnson raised this claim in his Third Amended Complaint, we hold that he cannot assert a valid cause of action. The record amply demonstrates that Johnson had custody of Jamir and Jamal under an order of supervision from the Juvenile Court that required defendants to visit the children at least monthly. (Defs.' Ex. 4, Order of Prot.; Collins Dep., p. 73-76.) Further, during this December 30, 1996 visit, defendants were investigating the alleged altercation between Johnson and Eason, which was a condition for case closure. Accordingly, we find that the record clearly reflects that the defendants had a valid reason to visit Johnson's

home. Therefore, we grant defendants' motion for summary judgment on this claim.

### 2. Negligence

We assume that Johnson's claim of negligence is based upon the following conduct of the defendants: 1) scheduling of parenting classes, counseling, and supervised visitation at inconvenient times; 2) their refusal to exercise their discretion to grant him unsupervised visitation from November 1995 to April 1996; 3) the threats allegedly communicated to and about him in December 1996; and 4) the referral for a second psychological exam. Johnson has alleged nothing to establish that the defendants negligently handled his family's case. To the contrary, Johnson claims that the defendants acted deliberately in retaliation for his protected speech. Because Johnson cannot prove a claim of negligence based upon evidence of intentional acts, we grant summary judgment on this claim.

### 3. Abuse of Process

The tort of abuse of process requires both the existence of an ulterior purpose or motive and some use of legal proceedings not proper in the regular prosecution of a lawsuit. *Holiday Magic, Inc. v. Scott,* 4 Ill. App. 3d 962, 967, 282 N.E.2d 452 (1st Dist. 1972). An actionable tort does not exist unless there is some improper use of the process of the court. *Id.* The only possible basis for Johnson's claim of abuse of process would rest upon an allegation that defendants offered testimony and recommendations to the Juvenile Court in an unjustified effort to prevent Johnson from obtaining unsupervised visitation and to keep his family's case from closing. As explained above, the record cannot support this assertion. The children's GAL, not the defendants, recommended against granting Johnson unsupervised visitation at a Juvenile Court proceeding in February 1996. Similarly, the GAL informed the court on

17

December 9, 1996 that the Johnson children mentioned an altercation between Johnson and Eason. There is simply no evidence to show that the defendants offered any false testimony to the court. Therefore, as there is no basis for Johnson's claim of abuse of process, defendants are entitled to summary judgment on this claim.

*4. Intentional Infliction of Emotional Distress*

The Illinois Supreme Court has articulated three requirements necessary to prove a claim of intentional infliction of emotional distress. First, the conduct involved must be truly outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or at least know that there is a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806 (Ill. 1988). To establish a claim of intentional infliction of emotional distress, a plaintiff must demonstrate that the conduct complained of is so outrageous and extreme in character that it goes beyond all bounds of decency and that the emotional distress caused by this behavior was severe. *Landstrom*, 699 F. Supp. At 1281 (citing Restatement (Second) of Torts § 46, comment d (1965)). In Illinois, "the more control which a defendant has over the plaintiff, the more likely that defendants' conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *McGrath*, at 86-87. In evaluating this factor, courts also look to the likelihood that the threat could be carried out. *See Honaker v. Smith,* 256 F.3d 477, 491 (7th Cir. 2001) (citing *Lopacich v. Falk*, 5 F.3d 210, 212 (7th Cir. 1993)).

We assume that plaintiff's claim is based upon defendants' alleged threats to keep the case from closing in December 1996 and their referral for a psychological exam later that month. Evidence relating to plaintiff's Section 1983 claim may help establish his allegation of intentional infliction of emotional distress and, thus, summary judgment is premature at this point in the proceedings. Defendants had a great deal of control over plaintiff's life and there was a high likelihood that they could have carried out any alleged threat. Plaintiff faces a difficult burden, however, of demonstrating that the complained of behavior did, in fact, cause severe emotional distress. He did not receive the referral for additional counseling until after January 4, 1997, and his family's case closed by January 8, 1997. At this point, however, we cannot say that defendants' alleged threats did not cause severe emotional distress. Instead, as a matter of law, we leave this issue for Johnson to develop at trial.

## CONCLUSION

For the foregoing reasons, we deny defendants' motion for summary judgment on Johnson's 42 U.S.C. § 1983 claim of retaliation and his pendant state claim intentional infliction of emotional distress. We grant the defendants' motion for summary judgment with respect to Johnson's claim of invasion of privacy, negligence and abuse of process. Finally, we limit Johnson's retaliation claim to those events that took place in December 1996 and January 1997. This case is set for status on Tuesday, June 3, 2003 at 9:00 a.m.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: 5/2/2003